NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

JENNIFER QUINTILIANI,
*Plaintiff/Appellant*,

*v.*

CONCENTRIC HEALTHCARE SOLUTIONS, LLC, dba CONCENTRIC
HEALTHCARE STAFFING, an Arizona limited liability company;
ANDREW M. JACOBS and JENNIFER JACOBS, aka JENNIFER
ENGELMANN, aka JENNIFER ENGELMANN
JACOBS, husband and wife[1],
*Defendants/Appellees*.

No. 1 CA-CV 15-0816
FILED 9-28-2017

Appeal from the Superior Court in Maricopa County
CV2010-099297
The Honorable David M. Talamante, Judge

**AFFIRMED IN PART; REVERSED AND REMANDED IN PART**

COUNSEL

Jackson White, P.C., Mesa
By Michael R. Pruitt, Nathaniel J. Hill
*Counsel for Plaintiff/Appellant*

---

[1]     On the court's own motion, it is ordered amending the caption on
appeal.  The above caption shall be used in all further filings with the court
in this matter.

Burch & Cracchiolo, P.A., Phoenix
By Daryl Manhart, Susanne E. Ingold, Sarah N. O'Keefe
*Counsel for Defendants/Appellees*

---

**MEMORANDUM DECISION**

Judge Michael J. Brown delivered the decision of the Court, in which Presiding Judge Samuel A. Thumma and Judge Patricia Starr[2] joined.

---

**B R O W N**, Judge:

¶1         Jennifer Quintiliani appeals from a judgment in favor of Concentric Healthcare Solutions, LLC ("Concentric") and its Director of Medical Staffing, Andrew Jacobs, following partial summary judgment and a defense jury verdict arising from the termination of her employment. Quintiliani argues the trial court erred in (1) granting Concentric's cross-motion for summary judgment on her claim under the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq. ("ADA"), and (2) denying her renewed motion for judgment as a matter of law and alternative motion for new trial on her interference claim under the Family and Medical Leave Act of 1993, 29 U.S.C. § 2611 et seq. ("FMLA").  Finding no reversible error as to the FMLA claim, we affirm the jury's verdict.  But because there is a genuine dispute of material fact as to her ADA claim, we reverse and remand for further proceedings consistent with this decision.

**FACTS AND PROCEDURAL BACKGROUND**

¶2         Quintiliani was employed by Concentric as a senior staffing coordinator from September 2007 to October 2009.  In early September 2009, Quintiliani began to exhibit flu-like symptoms and sought emergency medical attention.  During an emergency appendectomy, her doctor discovered the need for a hysterectomy, which was scheduled for the following week.

¶3         Quintiliani discussed her surgery schedule with her supervisor, Jacobs, and offered to work on-call shifts on the dates between

---

[2]     The Honorable Patricia Starr, Judge of the Arizona Superior Court, has been authorized to sit in this matter pursuant to Article VI, Section 3 of the Arizona Constitution.

the surgeries. At Concentric, an on-call shift consists of responding to staffing needs arising between 7:00 p.m. to 7:00 a.m., while an employee is at home. Quintiliani worked on-call shifts from September 12 through September 15. She used accrued paid time off ("PTO") to compensate for work time she missed due to the first surgery. Although aware that Quintiliani had the emergency appendectomy, Concentric did not offer her leave pursuant to the FMLA.

¶4　　　　Quintiliani's second surgery occurred on September 18, 2009. On September 24, Quintiliani told Jacobs she wanted to work on-call shifts while recuperating, and that she could return to work on September 28. She resumed on-call duties on September 25, and returned to the office on September 28. According to Quintiliani, upon her return, she offered to provide medical documentation to Jacobs but admitted she never gave anyone at Concentric doctors' notes, medical records, or notification of continuing treatment. During the week of September 28, Quintiliani elected to work 52 hours, which exceeded her doctor's recommendation that her work shifts be no more than six hours.

¶5　　　　On October 3, 2009, while working at Concentric's office, Quintiliani suffered hemorrhaging as a complication from the hysterectomy. She left work immediately and did not talk to Jacobs about the complication or her need for medical leave. Although Quintiliani believed she needed emergency care, after speaking with her doctor, she was advised she could manage the situation at home.

¶6　　　　Quintiliani did not have additional direct communication with Jacobs until she sent the following email to him on October 11:

> My next Doctor's appointment is on November 4, for post-surgeries testing and exams in hopes to be released from the doctor's care. I still have not been cleared for full-time work or regular activity. I am following up from last week, I asked you to call me to let me know what you needed me to do. I have not heard from you. Is there a reason I have not been paid my salary?

The next day, Jacobs responded by email:

> You have run out of PTO a long time ago so we can not pay you for hours you have not worked. I will need a doctor's note saying why you could not work over the last month and half and why [you] can not work for the next 3 weeks. You never told me to call you but I do not mind calling you. In

fact, it is your responsibility to communicate with me. We will need to talk about your hours moving forward.

¶7 Without further communication, Concentric terminated Quintiliani's employment on October 16 for failure to communicate with her supervisor. The termination letter signed by Jacobs stated, in part:

I have made numerous attempts to reach you by phone or email to discuss your medical situation but was unable to reach you. You did send me an email on October 11th, 2009, letting me know after you no called no showed to work the same day, that you were taking another 2 weeks off from work per your doctor. I replied to this email and asked that you provide me with a doctor's note on Monday October 12th, 2009 and I have yet to hear back from you.

Jacobs then paraphrased a portion of the Concentric Employee Manual:

If you are going to be absent from work you must speak with your manager directly. . . . Leaving a message is unacceptable. It is the employee's responsibility to call their manager directly. If you do not report to your manager for more than two days consecutively, it will be assumed by Concentric that you have resigned and you will be removed from payroll.

Jacobs concluded that Quintiliani violated "all of these rules and other policies and procedures," leaving Concentric "no choice but to part ways."

¶8 As relevant here, Quintiliani sued Concentric for interference with her FMLA rights and termination in violation of the ADA. Throughout the litigation, Concentric asserted various defenses, including the affirmative defense that Quintiliani was terminated for a reason unrelated to her medical condition. After considering competing motions for summary judgment, the trial court granted Concentric's motion on the ADA claim. On the FMLA claim, however, the court found there were genuine disputes of material facts precluding resolution as a matter of law, including (1) whether Quintiliani provided Concentric appropriate notice that she was seeking FMLA leave and (2) whether Concentric interfered with her rights under the FMLA.

¶9 Following a trial on the FMLA claim, the jury found in favor of Concentric. Quintiliani filed a renewed motion for judgment as a matter of law and alternative motion for new trial, which the trial court denied in

4

part, explaining that it would not reweigh the evidence. After additional briefing on the issue of whether Concentric's failure to provide notice of FMLA rights in its employee handbook constituted interference per se under the FLMA, the trial court denied the remainder of the motion and clarified its prior minute entry based on the following findings: (1) the jury instructions given were neither confusing nor unclear, and the parties were given an additional opportunity to argue their positions to the jury after an impasse instruction was given; (2) the jury's verdict confirmed that the issues pertaining to notice were determined in Concentric's favor; (3) Quintiliani was required to comply with the employer's usual and customary notice and procedural requirements for requesting leave; and (4) the October 11 email from Quintiliani to Jacobs failed to meet the required threshold for FMLA employee notice or the notice required by the employee handbook. After entry of a final judgment, this timely appeal followed.

## DISCUSSION

### A.     Motion for Judgment as a Matter of Law and Motion for New Trial

¶10          Quintiliani argues that because Concentric did not provide her with required general and individual FMLA notices, the trial court erred by denying her motion for judgment as a matter of law.

¶11          We review denial of a motion for judgment as a matter of law *de novo. Acuna v. Kroack*, 212 Ariz. 104, 110, ¶ 23 (App. 2006). We review the evidence in the light most favorable to upholding the jury verdict and will affirm "if any substantial evidence exists permitting reasonable persons to reach such a result." *Id.* at 110-11, ¶ 24 (citations omitted). Further, all evidence and reasonable inferences are to be considered in the light most favorable to Concentric, the party opposing the motion. *See Aegis, L.L.C., v. Town of Marana*, 206 Ariz. 557, 566, ¶ 34 (App. 2003).

¶12          The FMLA provides eligible employees with 12 weeks of unpaid leave each year for a "serious health condition" that makes the employee unable to perform the functions of the employee's position. *Guo v. Maricopa Cty. Med. Ctr.*, 196 Ariz. 11, 18, ¶ 29 (App. 1999) (internal quotation and citation omitted). An employee who takes FMLA leave is "entitled to return to the same or an equivalent position as was held before taking the leave." 29 U.S.C. § 2614(a)(1). An employer may neither interfere with an employee's attempt to exercise any FMLA rights nor discriminate against an employee who exercises FMLA rights. *See* 29 U.S.C. § 2615.

¶13        In this case, Quintiliani presented an FMLA interference claim to the jury. As provided in the jury instructions and verdict form, the parties agreed that proving such a claim required Quintiliani to establish (1) she had a serious health condition; (2) she gave appropriate notice of her need to be absent from work; and (3) Concentric interfered with the exercise of her right to FMLA leave.[3]

¶14        To prevail on an FMLA interference claim, "an employee must prove, as a threshold matter, that the employer violated [29 U.S.C.] § 2615 by interfering with, restraining, or denying his or her exercise of FMLA rights. Even then, [the enforcement section] provides no relief unless the employee has been prejudiced by the violation . . . ." *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002). Equally important, the FMLA anticipates employees will "comply with employer's usual and customary notice and procedural requirements for requesting leave, absent unusual circumstances," and if "an employee does not comply with the employer's usual notice and procedural requirements, and no unusual circumstances justify the failure to comply, FMLA–protected leave may be delayed or denied." 29 C.F.R. §§ 825.302(d), –.303(c).

¶15        Quintiliani argues that because Concentric never provided proper notice of her FMLA rights, she was entitled to judgment as a matter of law on her FMLA interference claim, or stated differently, Concentric should be held strictly liable for its failure to comply with applicable FMLA notice regulations. Within this argument, Quintiliani asserts the court erred by finding she was required to request FLMA leave to receive its benefits instead of requiring Concentric to inquire into whether this was an FMLA-qualifying situation. To analyze these arguments, we turn to the notice obligations of each party under the FMLA.

    1.    **General Notices**

¶16        Concentric, as an FMLA covered employer, was required to provide two types of general notice of FMLA rights to eligible employees—posted notice, and written notice in employee handbooks or its equivalent

---

[3]       The parties agree there are five elements for establishing an interference claim under the FMLA, as outlined in *Sanders v. Newport*, 657 F.3d 772, 778 (9th Cir. 2011). It is undisputed that Quintiliani satisfied the first two *Sanders* elements because she worked the qualifying number of months to be eligible for FLMA leave, and Concentric is an "employer" as defined by FMLA.

distributed writing. 29 C.F.R. § 825.300(a). Whether Concentric complied with posting requirements was plainly a jury question, with the parties presenting controverting evidence. It is undisputed, however, that Concentric did not provide notice of FMLA rights in a handbook or other distributed writing to its employees. But contrary to Quintiliani's assertion, failure to provide general notice in the form of a compliant employee handbook does not constitute a per se violation of the FMLA. *See* 29 C.F.R. § 825.300(e) ("Failure to follow the notice requirements set forth in this section *may* constitute an interference with, restraint, or denial of the exercise of an employee's FMLA rights.") (emphasis added). As such, Concentric's failure to comply with one aspect of the general notice requirements does not obviate Quintiliani's burden of establishing each of the elements of an interference claim. Similarly, the defective handbook did not preclude Concentric from presenting its defenses to the jury.

¶17          Quintiliani was required to demonstrate she was prejudiced by the omission of FMLA information in Concentric's handbook. *See Ragsdale,* 535 U.S. at 89. Quintiliani testified that she received a handbook and signed an acknowledgment that she "received and read a copy of the [handbook]." But she admitted she never read the handbook "cover to cover." She also testified that the handbook looked familiar but stated, "I didn't read [it] and know it inside and out. My questions for anything happening at Concentric was with my supervisor [Jacobs]. We just never really ever used this [handbook] for anything." When questioned about taking medical leave for her surgeries, Quintiliani responded:

> I didn't ask for specific time off. I was just working with [Jacobs] through the emergencies.

> \*          \*          \*

> I called [Jacobs] and asked him what I needed to do. I was having an emergency situation. And he told me just to keep him informed, which is what I did. If he would have asked me to do something else, I would have done it. It was just happening as it was happening.

¶18          This testimony demonstrates that, even if the handbook contained the requisite FMLA general notice, Quintiliani would not have consulted the handbook in planning her medical leave. As such, Quintiliani failed to demonstrate that as a matter of law she was prejudiced by the noncompliant handbook. Further, the jury was presented with substantial evidence to determine that "actual notice of the FMLA notice requirements"

was satisfied by Concentric through the "proper posting of the required notice at the worksite."  *See* 29 C.F.R. § 825.304(a).[4]

### 2.    Individual Notices

**¶19**      Quintiliani next argues that Concentric interfered with her FMLA rights as a matter of law by failing to provide the required individual notices.  Concentric counters that it was never informed of her need for medical leave and did not know why she "no called, no showed."

**¶20**      "When an employee requests FMLA leave, or when the employer acquires knowledge that an employee's leave may be for an FMLA-qualifying reason," the employer must notify the employee of (1) eligibility to take FMLA leave, (2) "rights and responsibilities" detailing the specific expectations and obligations of the employee, and (3) whether leave will be designated as FMLA-qualifying or otherwise.  29 C.F.R. § 825.300(b)-(d).  The employer's individualized notice requirement, however, is not triggered when an employee fails to communicate with an employer or request time off.  "Where an employee does not comply with the employer's usual notice and procedural requirements, . . . FMLA-protected leave may be delayed or denied."  29 C.F.R. § 825.302(d).

**¶21**      Quintiliani testified she was unfamiliar with the requirements of Concentric's handbook but she knew she was to "talk to [Jacobs]" about absences.  The 2009 handbook in place at the time of her termination stated:

> If you are unable to report to work for any reason, notify your Manager before regular starting time.  You are responsible for speaking directly with your Manager about your absence.  It is not acceptable to leave a message on a Manager's voice mail, except in extreme emergencies.  In the case of leaving a voice-mail message, a follow-up call must be made later that day.

---

4      Quintiliani also cites 29 C.F.R. § 825.304(a), asking us to apply an equitable principle akin to waiver or estoppel to prevent Concentric from enforcing policies found in a noncompliant employee handbook.  The FMLA, however, requires employees to comply with the practices and policies of employers and thus we decline to apply waiver or estoppel.  *See* 29 C.F.R. § 825.303(c).  On this record, failure to comply with a known company policy cannot be excused solely because Concentric's handbook lacked the general notice requirements of the FMLA.

The handbook also required employees to "notify your manager" when "unable to work owing to illness or an accident," and reminded employees "[i]f you become ill while at work . . . be sure to inform your Manager."

**¶22**          Viewed in the light most favorable to sustaining the jury's verdict, Quintiliani was aware that Concentric required communication with Jacobs regarding any absence from work and she failed to comply with this known policy. Concentric was aware of Quintiliani's two surgeries in September 2009, but Quintiliani failed to provide Concentric with any medical documentation before her termination to alert Concentric of the status of her medical condition or the need for ongoing care.[5] Quintiliani returned to work for a few days and then left work early without explanation and failed to communicate her need for medical leave. And to the extent she presented a different version of the events, it was the jury's role to weigh the conflicting evidence. *See Hutcherson v. City of Phoenix*, 192 Ariz. 51, 53, ¶ 14 (1998), *overruled on other grounds by State v. Fischer*, 242 Ariz. 44 (2017) ("[W]here there is a dispute in the evidence from which reasonable [persons] could arrive at different conclusions as to the ultimate facts, we will not disturb the findings of the trial court or the verdict of the jury . . . .") (internal quotations omitted); *see also Mora v. Chem-Tronics, Inc.*, 16 F. Supp. 2d 1192, 1209 (S.D. Cal. 1998) (determining whether FMLA notice is sufficient is a question of fact "better left to the jury with its traditional function of assessing human behavior and expectations").

**¶23**          Moreover, whether Concentric knew, in the week leading up to October 11, that Quintiliani's absence was related to her surgeries was disputed at trial. It was also disputed whether Concentric knew the extent of her medical condition before discharging her. Given these disputed issues of fact, the jury, by finding in favor of Concentric, could have reasonably inferred that Concentric did not have appropriate notice of Quintiliani's complications; rather, Concentric only knew that Quintiliani had recently undergone surgery, returned to full-time work, and then left without explanation on October 3 with no communication to Concentric until October 11, in violation of company policy. As such, Quintiliani was

---

[5]          Quintiliani argues that Concentric's response to her request for admission during formal discovery "establishes as a matter of law that Concentric had 'sufficient' notice of Ms. Quintiliani's need for medical leave." However, Concentric's response that "[Quintiliani] informed Andy Jacobs that she had a hysterectomy" and "had her appendix removed" does not establish as a matter of law that she adequately conveyed her need for medical leave after she resumed a full-time schedule.

not entitled to judgment as a matter of law due to Concentric's failure to provide individualized notices.

### 3. Substantial Evidence

**¶24** Quintiliani asserts that the trial court erred in denying her motion for new trial because the jury verdict was not justified by the evidence and was contrary to the FMLA. We review the denial of a motion for a new trial for an abuse of discretion. *Am. Power Prods., Inc. v. CSK Auto, Inc.*, 239 Ariz. 151, 154, ¶ 10 (2016). A court abuses its discretion when the record lacks substantial evidence to support the court's finding. *Romer-Pollis v. Ada*, 223 Ariz. 300, 302-03, ¶ 12 (App. 2009). We will reverse the denial of a motion for new trial "only if it reflects a manifest abuse of discretion given the record and circumstances of the case." *Styles v. Ceranski*, 185 Ariz. 448, 450 (App. 1996).

**¶25** Consistent with the foregoing analysis, on this record, reasonable minds could differ as to whether Quintiliani requested leave and thus triggered Concentric's obligations to advise her of leave rights under the FMLA. Quintiliani presented evidence that she was pressured into working and that she gave adequate notice of a need for medical leave; however, she also expressed a desire to work and did work between the two surgeries and after the second surgery. After returning to a full-time schedule, she left work on October 3 without notifying her manager and did not communicate with him until sending an e-mail on October 11. Reasonable minds could also differ as to whether Concentric proved its affirmative defense that Quintiliani was terminated for failure to communicate as required by Concentric's leave policy, which would constitute a non-FMLA reason justifying termination. Quintiliani acknowledged that she knew she was obligated to communicate with Jacobs but failed to do so. And, the termination letter specifically identified her lack of communication as a reason for her termination.

**¶26** The trial court denied Quintiliani's motion for a new trial based on her request to "re-weigh the evidence submitted to the jury and make a determination that the jury verdict is not supported by the evidence." It was for the jury to weigh the competing theories and the credibility of the witnesses, and it is not our role to reweigh the evidence on appeal. *See Van Emden v. Becker,* 6 Ariz. App. 274, 275 (1967). Accordingly, on this record the jury's verdict was substantiated by the evidence, consistent with the FMLA, and we find no abuse of discretion. *See Shaffer v. Ariz. State Liquor Bd.*, 197 Ariz. 405, 409, ¶ 20 (App. 2000) (recognizing that conflicting evidence can be substantial evidence).

### 4. Jury Instructions

**¶27** Quintiliani next argues the trial court erred in refusing to instruct the jury regarding several "distinct acts" committed by Concentric that would constitute interference with her FMLA rights.

**¶28** "We review the denial of a jury instruction for an abuse of discretion." *Reyes v. Frank's Serv. & Trucking, LLC*, 235 Ariz. 605, 612, ¶ 32 (App. 2014). The correctness of jury instructions as a whole is a question of law, reviewable *de novo* on appeal. *Desert Mountain Props. Ltd. P'ship v. Liberty Mut. Fire Ins. Co.*, 225 Ariz. 194, 199, ¶ 11 (App. 2010). In deciding whether a requested jury instruction should have been given, this court must view "the evidence in the light most favorable to the requesting party, and if there is any evidence tending to establish the theory posed in the instruction, it should be given even if contradictory facts are presented." *Andrews v. Fry's Food Stores of Ariz.*, 160 Ariz. 93, 95 (App. 1989). The trial court, however, is not obligated to give every jury instruction requested. *Hallmark v. Allied Prod. Corp.*, 132 Ariz. 434, 443 (App. 1982) ("It is not error to refuse to give requested instructions where the concepts contained therein are adequately conveyed through given instructions."). As such, we will not overturn a jury verdict based on the court's rejection of a jury instruction unless substantial doubt exists as to whether the jury was properly guided in its deliberations. *See Catchings v. City of Glendale*, 154 Ariz. 420, 424 (App. 1987).

**¶29** Quintiliani's proposed jury instructions, relying in part on model instructions (Model Civil Jury Instructions, For the District Courts of the Third Circuit (Oct. 2014), Interference With Right to Take Leave 10.1.1, pp. 8-10) outlined various ways in which interference with an employee's right to take FMLA leave could be found:

> 1) ordering an employee not to take leave or discouraging an employee from taking leave;
>
> 2) failing to include in all employment handbooks or manuals information concerning employee rights, entitlements, and obligations under the FMLA;
>
> 3) after acquiring knowledge that an employee's leave may be for an FMLA-qualifying reason, failing to notify the employee if they are eligible for FMLA leave;
>
> 4) after acquiring knowledge that an employee's leave may be for an FMLA-qualifying reasons, [sic] failing to provide a

written notice within five business days detailing the specific expectations and obligations of the employee and explaining any consequences of a failure to meet these obligations;

5) if the employer requested a certification from the employee's health care professional and did not allow the employee fifteen days to obtain the certification;

6) after acquiring knowledge that an employee's leave may be for an FMLA-qualifying reason, failing to notify the employee in writing whether the leave will be designated as FMLA-qualifying; or

7) terminating employment.

Concentric objected to the proposed instructions, asserting that some of the interference examples were neither included in the Third Circuit's model jury instructions nor supported by the evidence. In rejecting Quintiliani's proposed instruction as to examples four, five, and six, the court reasoned:

> [I]f it's a correct statement of the law, whether it's in a model instruction or not, in my mind, is not as important . . . . What's more significant to me is whether there are facts that support the language, unless you're telling me that it's an incorrect statement of the law.

¶30 Quintiliani argues that each of the three omitted examples were correct statements of the law and were supported by evidence in the record. Relying on *Andrews*, she asserts the examples were alternative grounds for liability and thus the trial court's decision to preclude them constitutes reversible error. In *Andrews*, the plaintiff was injured by falling in a store and brought a common-law negligence claim against the store. 160 Ariz. at 94. The trial court instructed the jury on a notice-based liability theory, but not the alternative theory of constructive notice. *Id.* at 95. We reversed because "the jury was precluded from imposing liability on a finding that [proprietor] had created the dangerous condition." *Id.*

¶31 Quintiliani does not explain why the omitted examples constitute alternate theories of liability for her interference claim; the examples are not alternative elements of the claim, as was the case in *Andrews*. Rather, she vaguely asserts that the omitted examples were each "an independent act of FMLA interference." Independent acts of FMLA interference, however, are not synonymous with alternative grounds of legal liability. Rather, the omitted examples are dependent on the unique

facts presented at trial in each case. A "trial [court] should not ordinarily single out a particular factual aspect of the litigation for special instructions because this may cause the jury to attach undue significance to it." *Bell v. Maricopa Med. Ctr.*, 157 Ariz. 192, 196 (App. 1988) (citing *Spur Feeding Co. v. Fernandez*, 106 Ariz. 143, 148 (1970)). Given the provisions of the FMLA, the regulations adopted thereto, and the cases interpreting them, there are undoubtedly dozens of examples of how one could establish an FMLA interference claim. But examples of how an interference claim may arise or be proven do not constitute legal theories. Instead, the legal theory for an FMLA interference claim is based on the established elements of the claim, which is precisely how the jury was instructed in this case. *Cf. Spur Feeding Co.,* 106 Ariz. at 148 (noting it would be reversible error to instruct the jury on a theory unsupported by the facts because the court would thereby invite the jury to speculate as to possible non-existent circumstances). Moreover, in her opening brief, Quintiliani does not direct us to any specific evidence in the record supporting the omitted instructions.[6]

**¶32** Quintiliani also argues that several jury questions submitted to the trial court confused the jury as to the application of the FMLA, FMLA employer notice requirements, and the effect of Concentric's employee handbook and policy.

**¶33** During jury deliberations, after the jury indicated it had reached an impasse, the trial court gave an impasse instruction that allowed the jury to submit additional questions to assist with its deliberations. The jury then submitted three questions:

> Do I have to find in favor of the plaintiff on all three reasons, counts, for me to find in favor of the plaintiff?
>
> Does the fact that Andy Jacobs didn't notify [Quintiliani] of her FMLA rights mean that Andy interfered with the exercise

---

[6] Based on the facts presented at trial, example 4, which pertains to the five-day notice provision of 29 C.F.R. § 825.300(b), may have been properly included in the jury instructions; however, as the jury presumably found, Quintiliani never provided Concentric with the necessary information to trigger the employer's obligation. *See* s*upra* ¶ 25. And even if she did, she admittedly failed to comply with Concentric's leave policy. Furthermore, assuming Concentric violated the five-day notice provision of 29 C.F.R. § 825.300(b), 29 C.F.R. § 825.300(e) provides that such failure "may" constitute interference; it would not trigger strict liability.

of plaintiff's right to FMLA leave based on Point No. 3 of verdict?

Did Andy Jacobs violate Concentric['s] employee manual policy and procedures 3.13 health-related issues by putting [Quintiliani] back to work without physician's release or restrictions on numerous occasions?  And is that state law?

To the extent there was jury confusion at the point of impasse, the court carefully fashioned an appropriate remedy in addressing the jury's questions.  After conferring with counsel, the court suggested that it read the questions to the jury and then give counsel five to ten minutes each to present arguments to the jury on those questions.  Quintiliani's counsel agreed with the court's suggestion, but Concentric's counsel objected to additional argument, preferring instead to draft an agreed-upon response. Concentric was concerned that further argument would cause confusion and prejudice, and urged the court to direct the jury to follow the previously given instructions.  Quintiliani did not present an alternative remedy but continued to concur with the court's suggestion that counsel present additional argument.  Over Concentric's objection, the court then allowed counsel to present their additional arguments to the jury on all three questions.

¶34            On this record, and particularly in light of the jury instructions as a whole and the arguments presented to the jury after the impasse instruction was given, Quintiliani has not shown the trial court abused its discretion by omitting three of the interference examples proffered by Quintiliani.  *See Catchings*, 154 Ariz. at 404 ("Jury instructions are viewed as a whole, with an eye toward determining whether or not the jury has been given the proper rules to apply in arriving at its decision.").

¶35            Because we conclude no reversible error occurred at trial, we affirm the jury's verdict on Quintiliani's FMLA claim.

## B.    Summary Judgment on ADA Claim

¶36            Summary judgment is appropriate if there are no genuine disputes of material fact and the moving party is entitled to judgment as a matter of law.  Ariz. R. Civ. P. 56(a).  We review the trial court's grant of summary judgment *de novo*, viewing the evidence and reasonable inferences in the light most favorable to Quintiliani. *BAC Home Loans Servicing, LP v. Semper Inv. LLC*, 230 Ariz. 587, 589, ¶ 2 (App. 2012). Summary judgment should not be granted where the evidence or

inferences would permit a jury to resolve a material issue in favor of either party. *Nat'l Bank of Ariz. v. Thruston*, 218 Ariz. 112, 116, ¶ 17 (App. 2008).

**¶37** Quintiliani argues the trial court improperly granted summary judgment in favor of Concentric on her ADA claim, asserting the court erred by concluding "there was an insufficient notice of the nature of Plaintiff's disability within the meaning of the ADA." Concentric counters that its defense to the ADA claim—that Quintiliani was terminated for violating company policy—is dispositive of the ADA claim.

**¶38** The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in . . . the . . . discharge of employees." 42 U.S.C. § 12112(a). Thus, to establish a prima facie ADA claim, Quintiliani was required to present evidence showing (1) she was "disabled" within the meaning of the ADA; (2) she was qualified for the job and able to perform the essential functions of the job; and (3) Concentric terminated her employment because of her disability. *See Guo*, 196 Ariz. at 17, ¶ 23. The ADA prohibits "adverse employment decisions motivated, even in part, by animus based on plaintiff's disability or request for an accommodation—a motivating factor standard." *Head v. Glacier Nw., Inc.*, 413 F.3d 1053, 1065 (9th Cir. 2005), *abrogated on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S.Ct. 2517, 2533 (2013). And, a "medical leave on account of a disability may be a reasonable accommodation under the ADA in certain situations." *Guo*, 196 Ariz. at 17, ¶ 26; *see also* 42 U.S.C. § 12111(9)(B) ("'[R]easonable accommodations' may include . . . job restructuring, part-time or modified work schedules . . . and other similar accommodations for individuals with disabilities.").

**¶39** Much of the parties' appellate briefing regarding this issue centers on whether Quintiliani is a disabled person within the meaning of the ADA, but Concentric conceded the first two elements of the ADA claim when it stated: "For purposes of this motion only, it is assumed that after having a hysterectomy on September 18th, [Quintiliani] could be considered *disabled under the ADA* and it is assumed that she was qualified under the ADA." (Emphasis added.) The trial court recognized the concession as follows:

> Both parties seem to agree that Plaintiff was "disabled" within the meaning of the ADA and that she was qualified for the employment position within the meaning of the ADA. The issue is whether she was terminated because of the claimed disability, which the parties agree is her loss of reproductive capability linked to the surgery of September 18, 2009.

Concentric, however, strayed from the issue when it urged the court to focus on whether "Concentric knew about [Quintiliani's] alleged disability" in determining whether she had provided sufficient evidence of causation. Likewise, on appeal Concentric argues that summary judgment was appropriate because Quintiliani never identified a disability.[7] In doing so, Concentric ignores its concession. Therefore, consistent with the trial court, we presume Quintiliani satisfied the first two elements of her ADA claim and focus only on the third element—whether disputed issues of material fact exist in the summary judgment record establishing that Quintiliani was terminated because of her disability. *See Guo*, 196 Ariz. at 17, ¶ 23.

**¶40** Proof of this third element may be demonstrated by "the temporal sequence between the protected expression and the adverse action," and may "thereby preclud[e] summary judgment on that ground." *MacLean v. State Dep't of Educ.*, 195 Ariz. 235, 245, ¶ 36 (App. 1999) (internal quotation and citation omitted). Termination because of a disability may be inferred by timing alone "when adverse employment actions are taken within a reasonable period of time" after the employer learns of the employee's disability or after the employee engages in protected activity. *Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 507 (9th Cir. 2000); *see also Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 1987) (recognizing termination because of a disability "can be inferred from timing alone where an adverse employment action follows on the heels of protected activity").

**¶41** Concentric terminated Quintiliani approximately one month after the surgical procedure that rendered her disabled, two weeks after she returned to the office from a modified on-call schedule, and four days after

---

[7] Concentric also argues Quintiliani failed to make a request for any accommodation. But the summary judgment record shows that Jacobs was aware of her requests for a modified work schedule. For example, (1) Quintiliani received a text message from Jacobs on September 25 acknowledging her request for a schedule with reduced hours as recommended by her "doc"; (2) Quintiliani sent Jacobs an email on October 11 to advise him she had not been cleared for full-time work and that her next medical appointment would be on November 4, "for post-surgeries testing and exams in hopes to be released from the doctor's care"; and (3) Jacobs sent the October 16 termination letter, acknowledging Quintiliani's October 11 email and that he was aware of her request to take "another 2 weeks off from work per your doctor." Given these facts, whether an accommodation was requested involves a material dispute requiring a jury to weigh the conflicting evidence. *See supra* ¶¶ 22-23.

communicating her need for additional time off from work. Given this timeline, considered together with (1) the concession that Concentric was aware of the hysterectomy and (2) Jacob's awareness of Quintiliani's requests for accommodation of a modified work schedule, a jury reasonably could infer that Concentric terminated Quintiliani because of her health condition and her requests for a modified work schedule. *See MacLean*, 195 Ariz. at 242, ¶ 26 (holding that conflicting evidence in the record and reasonable inferences therefrom were sufficient to raise a genuine issue of material fact as to an element of employee's ADA claim). *See Chuang v. Univ. of Cal. Davis*, 225 F.3d 1115, 1124 (9th Cir. 2000) (internal quotation and citation omitted) (recognizing that the degree of proof necessary to establish a prima facie case for an ADA claim "is minimal and does not even need to rise to the level of a preponderance of the evidence"). Based on the evidence provided in connection with the competing motions for summary judgment, a jury could reasonably find a causal connection between her disability and Concentric's discharge decision.

**¶42** Finally, Concentric argues Quintiliani was "terminated for violating company policy on absenteeism," not based on her hysterectomy. However, to the extent the summary judgment record reflects arguably legitimate, non-discriminatory reasons for any adverse employment action by Concentric against Quintiliani, the same record also includes reasons that could be found pretextual, leading to the conclusion that disputed issues of material fact exist as to whether discrimination was the real reason for the adverse employment action. *See MacLean*, 195 Ariz. at 246, ¶ 36; *see also McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-07 (1973) (explaining the proper burden shifting analysis applicable to employment discrimination cases). Because material issues of fact exist as to whether Quintiliani was terminated because of her disability, the trial court erred in granting summary judgment for Concentric on Quintiliani's ADA claim.

## CONCLUSION

¶**43**      We affirm the trial court's judgment on the FMLA claim, but reverse the summary judgment ruling on the ADA claim and remand for further proceedings consistent with this decision. Because each party has achieved partial success on appeal, we deny both parties' requests for attorney's fees and costs.



AMY M. WOOD • Clerk of the Court
FILED: AA